STATE EX REL. JOHN FLETCHER, Attorney-general, Appellee, v. NORTHWESTERN BELL TELEPHONE COMPANY, Appellant.

No. 41070.

JANUARY 12, 1932.

REHEARING DENIED JUNE 24, 1932.

Parrish, Cohen, Guthrie & Watters, Bracewell, Murrow & Poston, A. J. McBean, H. A. Poley, for appellant.

John Fletcher, Attorney-general, Oral Swift, Assistant Attorney-general, for appellee.

STEVENS, J.—The Northwestern Bell Telephone Company, incorporated, appellant herein, owns and operates a large number of exchanges in this and other states, together with a system of toll lines extending generally throughout such territory, and is also connected with the long distance lines of the American Telephone & Telegraph Company and associated companies. The Middle States Utilities Company and the Incorporated Telephone Company of Allerton, both incorporated, each own and operate independent local exchanges at Allerton, Iowa. Physical connection between the facilities of appellant and those of the Middle States Company has been maintained for many years. The Incorporated Telephone Company of Allerton, which was organized and began business about July 1st, 1930, is without physical connection with appellant at Allerton or with any other system doing a toll or long distance business at that point.

The refusal of appellant to permit the Incorporated Telephone Company to make physical connection with its switchboard and lines at Allerton upon the same terms and conditions as those accorded the Middle States Company was followed by this action in mandamus in the name of the State on the relation of the attorney-general to compel appellant to permit such physical connection to be made. There is no substantial or material

conflict in the evidence. The written contract under and by virtue of which physical connection of the Middle States Company was effected with appellant furnishes to subscribers and patrons long distance service over appellant's lines and their connecting systems. There is no controversy between appellant and the Middle States Company. So far as the record discloses, the contract and mutual arrangement between them is satisfactory, and neither desires its termination.

It should further be stated that there is nothing in the terms or conditions of the aforesaid contract which in any way limits the right of appellant to permit physical connection to be made by the Incorporated Telephone Company with its switch-board at Allerton. The sole controversy in this case is between the Incorporated Telephone Company and appellant.

Parallel situations have been the subject of litigation in other jurisdictions, but not previously in this state, with the result that we have at least two lines of clearly irreconcilable decisions as to numerous phases of the questions involved. An examination of all of the cases hereinafter cited which discuss the question will disclose that at common law public utilities were and are required to furnish equal facilities to the public, but that no duty rested thereon to make physical connection with any other like organization.

The minority rule announced and ably defended by the Supreme Court of Indiana in State v. Cadwallader, 87 N. E. 644, will first be given consideration. The Indiana case involved a controversy between two telephone companies which at the time of the trial and long prior thereto had effected and maintained physical connection and mutual use of their respective facilities. There is some uncertainty as to the exact terms and nature of the contract between them, but that is immaterial so far as the present discussion is concerned. The defendant in that case threatened to terminate the contract with the other party thereto and to sever physical connection therewith. The action, which was on the relation of a public officer, was in mandamus to compel the observance and continuance of the arrangement voluntarily entered into between them. The court upheld the contentions of the relator and declined to permit the threatened severance of their facilities.

The conclusion of the court, so far as this court is at present

concerned, was rested upon two distinct propositions: one, that defendant voluntarily entered into an arrangement by contract, by which the other party obtained the right to use its toll or long distance lines so that the public thus acquired an interest in continuance; and the other, that this action of the parties in making such connection was equivalent to a declaration of a purpose on its part to waive the primary right to remain independent, and imposed upon the property a public status which they might not disregard. That is, that they may not in such circumstances sever their connection and thus destroy the rights acquired by the public. The doctrine of the minority thus briefly stated has been approved and followed in a few jurisdictions. Campbellsville Tel. Co. v. Lebanon L. & L. Tel. Co., 80 S. W. (Ky.) 1114; R. R. Commission v. Northern Ky. Tel. Co. (Ky.) 33 S. W. (2d Ser.) 676; Clinton-Dunn Tel. Co. v. Carolina Tel. & Tel. Co., 74 S. E. (N. C.) 636; McCardle v. Akron Tel. Co., 160 N. E. (Ind.) 48; McCardle. v. Akron Tel. Co., 156 N. E. (Ind.) 469; U. S. Tel. Co. v. Central Union Tel. Co., 202 Fed., 66; State, ex rel. American Union Tel. Co. v. Tel. Co., 36 Ohio State, 296. Other cases cited by relator, which it is contended are in harmony therewith, but which a careful reading will show are distinguished by the facts, are the following: Ches. & P. Tel. Co. v. Baltimore & O. Tel. Co., 7 Atl. (Md.) 809; Williams v. Maysville Tel. Co., 82 S. W. (Ky.) 995; State v. Del. & A. Tel. & Tel. Co., 47 Fed. Rep., 633; Del. & A. Tel. & Tel. Co. v. Delaware, 50 Fed. 677.

In so far as the conclusion of the Indiana case and the other cases cited recognize and hold to the doctrine above stated, they are not strictly in point in the controversy before us. As stated, there is no controversy in this case between appellant and the Middle States Utilities Company with which physical connection is maintained. The Supreme Court of Indiana in dealing with the other propositions involved in the Cadwallader case went much further in its interpretation and application of the common law than any court had previously gone.

It is a rule of general recognition that where private property becomes, by the consent of the owners, invested with a public interest or privilege for the benefit of the public, the owner of such property can no longer deal with it strictly as private property, but must deal with it in its relation to the public.

Allnutt v. Inglis, 12 East Reports (Eng.) 527; Munn v. Illinois, 24 L. Ed., 77; State v. Cadwallader, supra.

Basing its argument upon this rule, the Indiana court reached the conclusion in the Cadwallader case that as defendant had effected physical connection at the point material in the case with other telephone companies not parties to the action, the appellant was bound to accord the same connection and service to all other telephone companies desiring the same; that is, by the dedication of the property and facilities of appellant to a public use, he was bound under the rules of the common law to furnish equal facilities to all other persons or companies similarly situated and engaged and of the same class. None of the other cases cited above involve this particular question. What is here said in the Cadwallader case is pertinent to the question for decision in the case before us.

We shall deal with the majority rule only in so far as it applies to the facts and circumstances of the case before us. As previously stated, under the rules of the common law, one telephone company was under no legal duty to make or permit physical connection of its facilities with any other. In the absence of statute requiring same, it is wholly optional with public utilities, such as telephone companies, whether they will make physical connection with other similar organizations or not. The whole question in this case at this point is: Did appellant, by voluntarily entering into the written contract with the Middle States Company and permitting physical connection to be made thereby with its switchboard and facilities, dedicate its property and facilities to a public use and thereby waive its right to remain independent of all other similar organizations? The right of appellant to refuse to contract with the Incorporated Telephone Company, if it had not already entered into the relation with the Middle States Company to which we have referred, was absolute. The only contract or arrangement which the Incorporated Telephone Company could in such circumstances have with appellant was such as it might voluntarily consent to. The right of private contract as to such matters therefore existed. The intention of the parties, which is to be determined by the terms of the contract, is the first thing to be considered. The Incorporated Telephone Company came into existence long after the arrangement between appellant and the Middle States Utilities Company was entered into. There is nothing in the circum-

stances to indicate an intention on the part of appellant to dedicate its property and facilities to the use and benefit of the public beyond that which previously existed or such as is indicated by the terms of the agreement. The duty of appellant to furnish equal facilities to the public, independent of statute or of some other understanding or agreement, applies only to its subscribers and persons or corporations desiring, upon usual terms, to avail themselves thereof. The majority rule preserves the right of private contract and under it one telephone company may make physical connection with a second without being bound to enter into a similar arrangement with a third. Home Telephone Co. v. People's Tel. & Tel. Co., 141 S. W. (Tenn.) 845; Home Tel. Co. v. Sarcoxie Light & Tel. Co., 139 S. W. (Mo.) 108; Okla-Ark. Tel. Co. v. S. W. Bell Co., 45 Fed. (2nd Ser.) 995; Pac. T. & T. Co. v. Anderson, 196 Fed., 699; Blackledge v. Farmers Ind. Tel. Co., 181 N. W. (Nebr.) 709; Union Trust & Sav. Bank v. K. Long Distance Tel. Co., 101 N. E. (Ill.) 535.

In addition to the foregoing authorities, the following cases in principle recognize the rule of the majority. Atchison T. & S. F. R. R. Co. v. Denver & N. O. R. R. Co., 28 L. Ed., 291; So. Pac. Co. v. I. C. C., 50 L. Ed., 585; Wis. M. & P. R. R. Co. v. Jacobson, 45 L. Ed., 194.

Public service corporations, such as telephone companies, are in a sense common carriers. They are, however, clearly distinguishable from common carriers of freight and passengers. Telephone companies do not receive or transport commodities. They permit, for a consideration, the use of their facilities for verbal communications. By the use thereof, the range of the human voice is much extended. In so far as telephone companies hold themselves out to the public as common carriers of news and intelligence, they are, under the rules of the common law, compelled to furnish equal facilities to the public, which includes corporations, partnerships and other organizations as well as individuals. A telephone company may not contract with a mercantile company to give it service and refuse to give similar service to a physician in the same community. Such holding out to the public cannot by any reasonable construction of the common law, however, it seems to us, be held to include separate entities having their own organizations, facilities and patrons and operating as competitors in the same line of business. The Incorporated Telephone Company and the Middle States Utilities

Company of Allerton are shown by the record to be active and vigorous competitors. More than 200 subscribers to the Middle States Company for service were lost to it during the month of July, 1930. Presumably, its competitors benefited to that extent. Mere physical connection of the Incorporated Telephone Company with appellant would, in the circumstances shown, benefit the public less directly than it would the corporation. We think it clear that appellant does not hold itself out as offering facilities to other similar corporations or persons so engaged as a part of its duty to the public. That it might do so and thereby dedicate its property and facilities to the public in such sense that it might be estopped from severing physical connection with some other utility or otherwise prevented from doing so may probably be conceded. No such question is involved or before us.

We are persuaded that the majority rule is supported by the better reasoning; therefore hold that the relief sought in this action is not available under any rule of the common law or voluntary act of appellant.

II. We come now to consider the statutory law of this state relative to telegraph and telephone companies, together with its historical development. The initial statute is found in Chapter 47 of the Code of 1851. Necessarily, this chapter dealt with telegraph companies only. So far as they are here material, the sections of the Code of 1851, with the exception of Section 783, have been preserved substantially in their original form up to and including the Code of 1931. Section 783 of the Code of 1851, with certain additions, became Section 2161 of the Code of 1897. This section was extended to include telephones. For convenience and as an aid to the interpretation of these statutes, we quote the following from the Code of 1851:

"Sec. 781. Such fixtures must not be so constructed as to incommode the public in the use of any highway or the navigation of any stream, nor shall they be set up on the private grounds of any individual without paying him a just equivalent for the damages he thereby sustains.

"Sec. 782. If the person over whose lands such telegraph line passes claims more damages therefor than the proprietor of the telegraph is willing to pay the amount of damages may be

determined in the same manner as is provided in cases of railroads and other works of internal improvement.

"Sec. 783. If the proprietor of any telegraph within this state, or the person having the control and management thereof, refuses to receive dispatches from any other telegraph line or to transmit the same with fidelity and without unreasonable delay all the laws of the state in relation to limited partnerships, to corporations, and to obtaining private property for the use of such telegraph shall cease to operate in favor of the proprietor thereof, and if private property has been taken for the use of such telegraph without the consent of the owner he may reclaim and recover the same."

Section 2161 of the Code of 1897, which corresponds with Section 8304 of the Code of 1927, is as follows:

"If the proprietor of any telegraph or telephone line within the state, or the person having the control and management thereof, refuses to furnish equal facilities to the public and to all connecting lines for the transmission of communications in accordance with the nature of the business which it undertakes to carry on, or to transmit the same with fidelity and without unreasonable delay, the law in relation to limited partnerships, corporations, and to the taking of private property for works of internal improvement, shall not longer apply to them, and property taken for the use thereof without the consent of the owner may be recovered by him."

Counsel entertain opposite views as to whether Section 8304 is strictly penal in character or merely declaratory of the common law. Section 780 of the Code of 1851 is clearly permissive, and grants to telegraph companies the right to construct their lines along the public highway, across rivers, and over the lands of private individuals. Section 781 places certain restrictions upon the rights thus granted, and requires the payment of damages for private property appropriated for the use of such companies. Section 782 provides a method of assessing damages to private property, and authorizes appeals as in the case of other internal improvements. The following section provides a penalty to be enforced against telegraph lines and companies if they refuse to receive dispatches from any other telegraph line or to transmit the same with fidelity and without unreasonable delay.

Section 8304, which includes telephone lines, applies the penalty if such company "refuses to furnish equal facilities to the public and *to all connecting lines* for the transmission of communications *in accordance with the nature of the business* which it undertakes to carry on, * * *" Nothing is added by this section to the duty of telegraph and telephone companies to furnish equal facilities to the public. Thus far, the statute has not been changed, and is in strict harmony with the common law. The words "connecting lines" are not defined by statute, *as is usual in the case of railways.* As ordinarily understood, the language would mean two or more lines physically or otherwise connected for the purpose of and so as to permit the ordinary joint use of their respective facilities. It is difficult to always know and accurately define legislative intent. The facilities of telegraph companies and telephone companies are wholly different. The one transmits messages by the aid of its own instrumentalities and agencies, while the other accords the use of its facilities to the patron for the purpose of extending verbal communications. Two or more telephone companies or two or more telegraph companies may unite their facilities and become connecting lines. A connecting line must be one that has united its facilities with some other person or company engaged in the same business or sustains such relations thereto as that they are, by reason thereof, capable of carrying out and consummating the communication tendered. Only by a physical connection can this be accomplished by telephone. Whether we treat Section 8304 as strictly penal in character or otherwise, it does not in clear and definite language require the physical connection of telephone exchanges owned and operated by separate entities. The statute recognizes the presence of connecting lines, but when given its most liberal construction, we find nothing therein which makes it obligatory upon one telephone company to physically connect its facilities with another. If they do effect physical connection, they are bound to furnish equal facilities to all.

This exact question has arisen in other jurisdictions which involve statutes much more certain and definite than Section 8304, which are held not to require physical connection. Home Telephone Co. v. People's Tel. & Tel. Co., supra; Home Tel. Co. v. Sarcoxie Light & Tel. Co., supra; Clay County Co-Op. Tel. Assn. v. S. W. Bell Co., 190 Pac. (Kans.) 747; Okla.-Ark. Tel. Co. v. S. W. Bell Co., 45 Fed. (2d Ser.) 995.

Aside from the extension of the law applicable to telegraph companies to telephone companies, there is nothing in the history of the statute that substantially aids in the construction thereof. See in this connection the following cases cited by relators, but which offered us no assistance: Iowa Union Tel. Co. v. Board of Equalization, 67 Iowa, 250; Franklin v. N. W. Tel. Co., 69 Iowa 97; Chamberlain v. Iowa Tel. Co., 119 Iowa 619; Phelan v. Boone Gas Co., 147 Iowa 626; Huffman v. Tel. Co., 143 Iowa 590.

That telephone companies are quasi public in character and subject to the control of the state, as are other similar corporations, there can be no doubt. Relator concedes that Section 8304, of and in itself, is not sufficient to require physical connection. Section 783 of the Code of 1851 recognized the duty of common carriers to furnish equal facilities to the public, and made the failure on the part of such companies to observe the same grounds for subjecting them to the penalty of forfeiting their rights. We are unable to construe Section 8304 and related statutes even by the most liberal interpretation so as to give them the effect sought —that is, of requiring appellant to permit physical connection with its facilities by the Incorporated Company. The question is for the legislature.

It follows that the judgment and decree of the court below must be and it is—Reversed.

WAGNER, C. J., ALBERT, MORLING, KINDIG, and GRIMM, JJ., concur.